**Affirmed and Opinion Filed November 18, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-01203-CV

## RHONDA JEAN FULLER, Appellant
## V.
## JOHN SCOTT DEFRANCO, Appellee

### On Appeal from the 382nd Judicial District Court
### Rockwall County, Texas
### Trial Court Cause No. 1-18-0724

## MEMORANDUM OPINION

Before Justices Myers, Nowell, and Evans
Opinion by Justice Nowell

John Scott DeFranco sought a declaratory judgment that there was no marriage between himself and Rhonda Jean Fuller. Fuller filed a counter-petition for divorce alleging the parties had an informal marriage that began approximately on August 1, 2014. Following a three-day bench trial, the trial court entered a final order declaring DeFranco and Fuller were never married to one another; the trial court also entered findings of fact and conclusions of law. In a single issue, Fuller

argues the evidence is factually insufficient to support the trial court's finding that the parties were not married to each other.[1] We affirm the trial court's final order.

FACTUAL BACKGROUND

**A. General Overview**

DeFranco and Fuller met in 2011 or 2012 on a dating website. Fuller and her adolescent children moved into DeFranco's house in 2012 or 2014. The parties lived in the house together until they broke up in 2016, and Fuller and her children moved out. Fuller and her children moved back into DeFranco's house when the parties reconciled later that year. The parties continued living together in DeFranco's house from late 2016 until February 2018. DeFranco and Fuller broke up on or about February 14, 2018, and did not reconcile.

The parties both testified they never formally married and did not complete a declaration of informal marriage with the county clerk's office. They never exchanged or wore engagement or wedding rings. Fuller did not change her name or use the name "DeFranco" until after they broke up in 2018.

DeFranco's and Fuller's tax returns for the relevant years are included in the record. They each filed as head of household each year; neither filed as married

---

[1] Fuller's sole issue states: "Did the trial court err in determining that the parties were never informally married to each other?" Fuller does not provide a standard of review, but rather argues the trial court's findings of fact and conclusions of law are against the great weight and preponderance of the evidence. Based on the substance of her argument, we interpret her issue to be that the evidence is factually insufficient to support the trial court's final order.

during the years they were together. Each claimed their own biological children as dependents, but did not claim the other party's children as dependents.

Throughout trial, DeFranco maintained they had a "boyfriend/girlfriend" relationship or a "domestic partner" relationship; Fuller maintained they had an informal marriage beginning in August 2014.

**B. Signed Documents Relating to Marital Status (2015)**

DeFranco is a pilot for American Airlines, and the parties wanted Fuller to have access to flight benefits. DeFranco testified he initially added Fuller to his travel benefits as a "registered companion." Fuller later realized her children and mother could also have travel benefits if she were DeFranco's "domestic partner" or "spouse," and DeFranco agreed to change Fuller's status to domestic partner.

On April 9, 2015, Fuller told DeFranco that American Airlines limited domestic partner status in the United States to same-sex couples. However, four days later, she texted him: "I found the right forms and the AA policy to show that we are domestic partners. Can I sign your name and send them in?" He responded: "Yes but they might check the signatures. Is there a need to rush[?]" On May 26, 2015, she texted him: "We have to have an affidavit notarized to add me as a domestic partner." He replied: "Ok."

The record includes a form affidavit that appears to have been prepared by American Airlines. It was signed by DeFranco and Fuller and notarized on June 2, 2015. The first paragraph of the affidavit states: "That by mutual assent they entered

into a non-solemnized common-law marriage in the State of ___Texas___ on or about ___08/01/2014___."[2]  The affidavit further states that at the time of contracting their common-law marriage in Texas, they had a bona fide intention to create and enter into a legal marriage, they live together in Texas and hold themselves out to the public to be husband and wife, and they recognize their common-law marriage is as binding as a statutory marriage.  DeFranco testified he signed the affidavit to obtain flight benefits for Fuller; his purpose was not to establish a marital relationship with her.

The affidavit does not have a Bates label indicating it was produced in discovery.  However, a substantially similar version of the document with a Bates label showing Fuller produced it in discovery was also admitted at trial.  The first paragraph of the Bates-labeled version states: "That by mutual assent they entered into a non-solemnized common-law marriage in the State of ___Texas___ on or about _____."  DeFranco testified he did not know whether the date field was completed when he signed the document.

DeFranco testified the date of August 1, 2014, the date on which Fuller asserts they married and that appears in one version of the affidavit, was not significant to him.  They did not celebrate an anniversary on August 1 and he never associated the date with their relationship.  Until he saw August 1, 2014, in her counter-petition, he

---

[2] The sentenced is pre-printed typed except for the word Texas and the date, which were completed by hand.

did not know she believed they got married on that day. Fuller testified August 1, 2014, was the date she initially moved into DeFranco's house.

DeFranco also named Fuller as the primary beneficiary of his American Airlines-provided life insurance, accidental death and dismemberment, and personal accident insurance policies; he named his children as contingent beneficiaries.

On April 14, 2015, DeFranco signed a document created by the Texas Health and Human Services Commission titled "Declaration of Informal Marriage" in which he and Fuller swore that on or about August 1, 2014, they agreed to be married, they lived together as husband and wife in Texas after that date, and represented to others they were married.

Fuller executed her will on January 17, 2015; the will was witnessed by two people, including DeFranco's brother, but not notarized. Under the heading "Marital Status," the will states she is "in a common law relationship with John DeFranco." The document names "my common-law spouse, John DeFranco" as an executor of the will, leaves the contents of her estate to her "spouse," and appoints "my spouse, John DeFranco" as the guardian of her minor children. DeFranco testified he was not aware of the will and did not recall seeing it until trial.

**C. Text Message Communications (2015-2016)**

Text messages[3] in the spring and summer of 2015 show the parties discussed breaking up and Fuller moving into her own apartment. DeFranco testified that Fuller was looking for more commitment from him and she wanted to get married.

| Date | To | From | Content |
|---|---|---|---|
| 5-13-15 | DeFranco | Fuller | You don't want a girlfriend. You're not looking for a future wife. You look at me as a roommate. |
| 5-25-15 | DeFranco | Fuller | I want my boyfriend. |
| 5-25-15 | DeFranco | Fuller | You're such an ASS when it comes to anything regarding marriage. Trust me. I know we aren't married and that you have zero intention of it. You wear it like a badge of honor. |
| 5-28-15 | DeFranco | Fuller | You put more effort into making sure I know that we aren't married than you do dating me. . . . You put more effort into being everyone's friend than you do being my boyfriend. |

In June 2015, Fuller asked DeFranco if she could borrow money so she could move into an apartment. On June 14, 2015, she texted DeFranco that her daughter wanted to move to Forney, and Fuller could sign a lease the following day. The same day she texted DeFranco: "What do you mean how? It's simple. I move out. We break up." Fuller never moved out in the summer of 2015, and text messages show their relationship continued.

---

[3] Typographical errors are original to the texts.

In June 2015, Fuller sent a text message to DeFranco stating: "I'm sorry I overreacted the other day. I don't know why I'm so sensitive about that. It's not like I am upset we aren't married. I guess just hearing your aversion to it makes me feel like you must not love me." In another text messages during the summer of 2015, Fuller referred to DeFranco as her "boyfriend" and, on August 30, 2015, DeFranco told her: "I'm so sorry I hurt u and I'm truly sorry I couldn't be the boyfriend you needed. I love u Rhonda jean." On September 18, 2015, Fuller texted DeFranco:

> When you asked us to move in, I viewed you as my knight in shining armor because you were relieving me of some of that financial burden . . . But when you started demanding that I pay rent, I felt so unwanted and unloved because it wasn't that you needed the money, you just thought I owed it to you. Fair enough. From my perspective, however, I saw a man not wanting to provide or care for his partner. I saw a man wanting to pad his bank account at the expense of his partner struggling. I saw a man that didn't see me as a life partner or an equal . . . just a roommate.
> . . .
> I still don't know what our future holds. I love you, but I don't feel safe and secure. The way you shun any thought of marriage and the way you talk to me like I'm still auditioning for the role is a slap in the face
> . . .

Text messages show the parties' relationship continued into 2016, and they continued fighting. On February 14, 2016, Fuller texted DeFranco: "You're right. I am guilty. I'm guilty of letting you be a complacent boyfriend and letting you think that it's OK to not date me." By May 2016, the texts indicate Fuller considered moving out and asked DeFranco to help her pay rent, deposits, and moving expenses.

–7–

In June 2016, the topic of divorce was raised.  The parties disputed whether they were in a common law marriage and would need to divorce.

| Date | To | From | Content |
|---|---|---|---|
| 6-2-16 | Fuller | DeFranco | There is no divorce u fucking moron |
| 6-2-16 | DeFranco | Fuller | And, yes.  A divorce is necessary. |
| 6-2-16 | Fuller | DeFranco | We have never told any one we r married as a matter of fact I have told everyone I am never getting married |
| 6-2-16 | DeFranco | Fuller | Well, we told AA and I have a notarized paper. |
| 6-2-16 | Fuller | DeFranco | That is so u can get cheaper insurance.  U r a domestic partner not a wife.  U r moving out tomorrow. |
| 6-2-16 | DeFranco | Fuller | No. It stated we are common law.  I have it in the car.  I'll show you when I get home. |
| 6-2-16 | Fuller | DeFranco | That's your scam.  I didn't agree to that |
| 6-2-16 | DeFranco | Fuller | Lol. No scam. You signed it and notarized it when you were in love |
| 6-2-16 | Fuller | DeFranco | No I didn't. |

Fuller moved out of DeFranco's house in the summer of 2016.  During the time they lived separately, Fuller referred to DeFranco as her "ex-boyfriend."  On September 23, 2016, she texted him: "You are right that "we" get to define who we are at this point.  My definition of you is my ex-boyfriend.  Not a fling or a booty call or a friend with benefits. . . . You have made it very clear to me and everyone you know that we no longer have a future together."  The following day she again told DeFranco he was her ex-boyfriend: "And when did I say you were the perfect

boyfriend? I said you were the perfect EX boyfriend and we wouldn't be going through this if you would have been this nice and attentive earlier."

The parties reconciled in the fall of 2016 and decided to open joint bank accounts. DeFranco testified they had joint accounts "[b]ecause she said I wasn't committed to it and I was trying to prove I was committed to this relationship." He stated he "was committed to the relationship because we were going to get married. We talked about getting married multiple times."

In November 2016, they discussed publicly announcing they were back together, their engagement, and a wedding.

| Date | To | From | Content |
|------|------|------|---------|
| 11-26-16 | DeFranco | Fuller | I'm off but it's ok if we can't go<br>I'll put you back on when we are official. |
| 11-26-16 | Fuller | DeFranco | We r official |
| 11-26-16 | DeFranco | Fuller | Public official |
| 11-26-16 | Fuller | DeFranco | Let's do it now then. I ain't scared<br>I'm serious |
| 11-26-16 | DeFranco | Fuller | No. |
| 11-26-16 | Fuller | DeFranco | Ok<br>When r u thinking |
| 11-26-16 | DeFranco | Fuller | Honestly . . . when we're engaged. |
| 11-26-16 | DeFranco | Fuller | I want it to be a WOW moment when we announce it so everyone knows we are the real deal. Otherwise, we just seem like one of "those" couples. |
| 11-26-16 | Fuller | DeFranco | U want the WOW when we Announce we r back together or we r getting married? |

| | | | |
|---|---|---|---|
| 11-26-16 | DeFranco | Fuller | I guess I was thinking it would be the same announcement. |
| 11-26-16 | Fuller | DeFranco | Ok |
| 11-26-16 | Fuller | DeFranco | But if we r getting married this summer it may be hard to do. |
| 11-26-16 | DeFranco | Fuller | Kinda what I was thinking. I think we can do the engagement, wedding, honeymoon for 7 . . . All for about $10,000. |
| 11-26-16 | DeFranco | Fuller | You do realize that $10,000 includes a vacation for 7 people and a ring. That's pretty dang cheap. |
| 11-26-16 | Fuller | DeFranco | Not a ring. I figured the ring would be a minimum of 10. We have a sit load to talk about. |
| 11-26-16 | Fuller | DeFranco | I'm really excited about this. I hope u r? |
| 11-27-16 | Fuller | DeFranco | I'm excited about marrying u and spending the rest of my life with u.<br>I'm excited about spending more time with u and doing fun shit and bringing my girlfriend/wife to work |
| 11-27-16 | DeFranco | Fuller | I like hearing you say that stuff. |
| 11-27-16 | DeFranco | Fuller | I really need to hear that stuff to call that voice in the back of my head that says this is just a temporary thing because you were jealous about me dating. |

In December 2016 and January 2017, Fuller and DeFranco continued referring to one another as "boyfriend" and "girlfriend" in their text messages. On January 17, 2017, DeFranco texted Fuller: "I look forward to calling u my wife instead of my girlfriend I love u." She responded: "That means a lot hearing that! I love you!!!!"

## D. Signed Documents Relating to Marital Status (2016-2017)

DeFranco's signature appears on a Texas Hazelwood Act Exemption Application, which allows a veteran or veteran's child or spouse to receive a college tuition exemption at Texas public universities, dated December 11, 2016. The application was made on behalf of one of Fuller's daughters who was applying to college and shows the daughter is DeFranco's child. DeFranco was not asked whether he signed the document or Fuller signed on his behalf.

When DeFranco applied to China for a visa on December 30, 2016, he stated he was married and listed Fuller as his "spouse" and "wife."

On January 6, 2017, DeFranco gave Fuller access to his Fidelity accounts as his "wife" and made her the primary beneficiary on those accounts; paperwork from the Fidelity accounts shows Fuller was his "spouse." His children were the contingent beneficiaries.

DeFranco is a U.S. Army Reserve Officer. In that capacity, he executed applications for military identification cards for Fuller and her children. The identification card issued to Fuller is dated January 3, 2017, and states her relationship is "SP." Fuller testified she obtained the identification card as DeFranco's spouse and she could not have done so as his girlfriend. She testified she and DeFranco went to a military base and represented to a military officer that they were married. Also on January 3, 2017, DeFranco executed three "Application

for Identification Card/DEERS Enrollment" forms, one for each of Fuller's children, showing each child was his step-child.

Likewise, DeFranco obtained military license plates for Fuller. Fuller testified DeFranco had to present documentation showing he was married to Fuller to obtain the plates because the car was in her name.

On June 28, 2017, DeFranco signed a "Declaration of Status of Dependents" form created by the Department of Veterans Affairs. The form shows he married Fuller on June 2, 2015; he represented Fuller as his spouse several times on the form and listed her children as his step-children.

DeFranco had a service members' group life insurance policy. On October 15, 2017, Fuller, identified as DeFranco's spouse, was made the primary beneficiary of his policy and his children were the secondary beneficiaries.

Fuller testified DeFranco's home was insured with USAA, and she was listed as his spouse on that policy. Additionally, a "Record of Emergency Data," a voluntary form DeFranco completed with the Army, shows Fuller as his "spouse" and his "wife." The form shows his two biological children as his children; it does not list her children. Fuller is listed as his beneficiary.

When asked to explain whether he lied to the military when he signed the application for Fuller to obtain a military identification card stating she was his wife, he explained:

So basically I was told that the wives and girlfriends could come to the dining out in California, so I go, can they fly on the military planes? And Lieutenant Clary is, like, no, they have to be in the DEERS[4] system.

Well, I made mention of that to Rhonda when I came home. She goes, well, let's put me in the DEERS system. I go, we are not married. I am not putting you in the DEERS system. . . you have to have a marriage certificate.

And so it became an argument between us, and it became a fight between us, and I didn't want to do it, and then I went ahead and acquiesced, thinking, well, she is going to go over there, and they are going to look at the document from a - - she goes, let's use American Airlines - - the document you signed with American Airlines and let's see if they will take it. And I'm, like, we are going to get married in six or seven months. You know what? It probably won't make any difference, and now I don't have to be the bad guy because they are going to turn her down, and they are going to say, no, this isn't a marriage certificate.
. . .

So because the marriage certificate - - they don't have a marriage certificate. The army screwed up, too. We are both at fault here. They should have never accepted the form that I signed with American Airlines. It was not a legal form, and they are at fault, too. We are both at fault. . . .

So when you asked me why I did this, this is why I did it, to help her and her kids to get her on the passenger list so she could fly to California. And when you asked me would I do it again, heck, no, I wouldn't do it again. Did I compromise my integrity? Yes. Okay. Had I - - did I say specifically to them we were married? No. But did I sign that stating that because of that form and they accepted it? The army is going to take it. I'm good with it. The army does a lot of things that I am good with and some things that I'm not.

In October 2017, Fuller submitted a Federal Student Aid application for her daughter. The form shows Fuller's marital status as "divorced or separated" and lists the date she divorced her ex-husband, July 2011.

---

[4] DEERS is not defined in the record.

## E. Wedding

The parties chose a date and location for their wedding: June 9, 2018, at a resort in Mexico. On July 25, 2017, Fuller completed a credit card charge authorization form for the resort and selected the option that the couple would have a "Symbolic (Non Legal)" wedding.

Fuller explained they were going to have a "civil ceremony," but not obtain a marriage license because they were already married. They were having the ceremony because she wanted wedding pictures. She testified: "We were absolutely common-law married"; "[h]e absolutely knew we were common-law married"; and there was "no need" for a legal wedding.

## F. Relationship Ends

On February 14, 2018, the parties broke up and did not reconcile. Fuller moved out of DeFranco's house.

After the breakup, Fuller sought to purchase a home. On June 29, 2018, Fuller signed a Uniform Residential Loan Application. In response to the box asking "Manner in which Title will be held," she wrote "Single woman." She also checked the box for "Unmarried (include single, divorced, widowed)." She provided DeFranco's address as her "present address" and indicated she had been renting there for 4.3 years. The Deed of Trust on the property, also dated June 29, 2018, shows the borrower is "Rhonda Fuller SINGLE WOMAN"; Fuller signed the Deed of

Trust.  Likewise, the warranty deed shows the grantee is Rhonda Fuller, a single woman.

In August 2018, Fuller wrote several checks, including some to DeFranco. The printed payor's name on the checks is: "RHONDA FULLER IS NOT YOUR WIFE."  She handwrote the named payee as "John DickFranco."  Fuller testified she ordered the checks as "post divorce checks," noting the date on the checks is about a week after she filed her counter-petition for divorce.

### G. Parties' Testimony About Their Relationship Status

Throughout the trial, DeFranco maintained he and Fuller were boyfriend/girlfriend, domestic partners, and "married on paper."  When asked to explain "married on paper," DeFranco testified:

> that was because I had signed the documents stating - - you know, for American Airlines stating we were common-law married, and that was because that was the only document they required or they would take from us because we couldn't prove we were domestic partners.  It was all to become a domestic partner, and so anything - - that's why - - I signed a whole bunch of stuff like you have seen, and it was all to give her and her daughters and her son benefits.  Everything I have signed was basically to give them benefits.

When asked whether he ever referred to Fuller as his wife, he testified: "Yes, I may have.  I don't remember, but I probably have jokingly. . .."

Fuller maintained the parties had a common-law marriage.  She testified: "John - - on our good days, you know, we were married, and he told the world.  On our bad days, he - - you know, he would try to say, oh, we are just married on paper,

–15–

you know, and that kind of stuff." DeFranco promised her "we were married and, you know, we were going to be together forever."

FINDINGS OF FACT & CONCLUSIONS OF LAW

Following a three-day bench trial, the trial court entered the following findings of fact:

1. Petitioner and Respondent were not ceremonially married.
2. Petitioner and Respondent did not sign a Declaration of Informal Marriage pursuant to Sec. 2.402 of the Texas Family Code.
3. The parties resided together from time to time between 2014 and 2018.
4. During some of this time[,] the parties mutually indicated to others in the form of written documents that they were spouses.
5. The evidence supports a conclusion that the purpose of these written documents was to obtain a financial benefit from Petitioners [sic] employer and from Petitioner's position with the United States Military that the parties would not otherwise have been entitled to as an unmarried couple.
6. During this time, the parties also indicated in other written documents, such as income tax returns and loan applications, that they were not spouses.
7. Also during this time, conversations between the parties through numerous e-mails as well as other documents, reflected an understanding that Respondent knew the parties were not married and reflected her awareness that Petitioner had no intent or present agreement to be married.
8. The parties had no mutual intent or agreement to be married on August 1st, 2014 or at any time during which they cohabited.

The trial court entered the following conclusions of law:

1. Respondent had the burden of proving the elements of an informal marriage, and that the elements were occurring at the same time.
2. The evidence presented by Respondent was insufficient to establish the burden of proof that both parties mutually intended and agreed to be married and thereafter lived together and represented to the public that they were married, either on August 1, 2014 as alleged

–16–

in Respondents' [sic] pleadings, or at any other time between 2014 and 2018.

The trial court entered a final order granting John DeFranco's petition for declaratory judgment and denying Rhonda Fuller's counter-petition for divorce. The order declares the parties were never married to one another. This appeal followed.

LAW & ANALYSIS

In a single issue, Rhonda argues the evidence is factually insufficient to support the trial court's finding of fact number 8 that the parties had no mutual intent or agreement to be married on August 1, 2014, or at any time during which they cohabited.

**A. Standard of Review**

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). When reviewing the factual sufficiency of evidence, we review all the evidence and will set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See id.* In a bench trial, the trial court is the factfinder and the sole judge of the witnesses' credibility and the weight to be given their testimony. *Wright Group Architects-Planners, P.L.L.C. v. Pierce*, 343 S.W.3d 196, 199 (Tex. App.—Dallas 2011, no pet.); *Interest*

*of N.A. F.*, No. 05-17-00470-CV, 2019 WL 516715, at *5 (Tex. App.—Dallas Feb. 11, 2019, no pet.) (mem. op.). We may not pass upon the credibility of the witnesses or substitute our judgment for that of the trial court, even if the evidence would support a different result. *Pierce*, 343 S.W.3d at 199; *Interest of N.A. F.*, 2019 WL 516715, at *5.

A trial court's findings of fact have the same weight as a jury's verdict and are reviewed under the same standards that are applied in reviewing evidence to support a jury's verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

## B. Informal Marriage

Section 2.401 of the Texas Family Code provides that an informal marriage may be proved by evidence that the parties "agreed to be married and after that agreement they lived together in this state as husband and wife and there represented to others that they were married." TEX. FAM. CODE ANN. § 2.401(a)(2). The circumstances of each case must be determined based upon its own facts. *Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex. 1981); *Interest of N.A. F.*, 2019 WL 516715, at *4. The existence of an informal marriage is a fact question, and the party seeking to establish the marriage bears the burden of proving the three elements by a preponderance of the evidence. *Interest of N.A. F.*, 2019 WL 516715, at *4 (citing *Small v. McMaster*, 352 S.W.3d 280, 282–83 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)).

Evidence of cohabitation and holding out the other party as one's spouse may constitute some evidence of an agreement to be married depending on the facts of the case. *Assoun v. Gustafson*, 493 S.W.3d 156, 160 (Tex. App.—Dallas 2016, pet. denied). Because in modern society it is difficult to infer an agreement to be married from cohabitation, evidence of "holding out" must be particularly convincing to be probative of such an agreement. *Id*. Holding out requires more than occasional references to each other as "wife" or "husband." *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.). A couple's reputation in the community as being married is a significant factor in determining the holding out element. *Id*.

## C. Analysis

The record contains a considerable number of text messages between the parties that show they considered themselves boyfriend/girlfriend and not spouses. Although Fuller contends the parties agreed to be married in 2014, several months later, her texts to DeFranco show she considered herself to be his girlfriend. Her text messages included one stating: "You're such an ASS when it comes to anything regarding marriage. Trust me. I know we aren't married and that you have zero intention of it. You wear it like a badge of honor." Likewise, she accused him of "put[ting] more effort into making sure I know that we aren't married than you do dating me." These text messages are representative of many others in the record showing Fuller knew she was DeFranco's girlfriend, she considered him to be her boyfriend, and DeFranco did not intend to get married. Although Fuller testified she

–19–

used the word "boyfriend" in texts to be "playful and flirty," the trial court could have determined Fuller was not being "playful and flirty" when she sent many of the text messages complaining about DeFranco's actions as her boyfriend and his unwillingness to get married.

Likewise, when Fuller considered moving out of DeFranco's house in the summer of 2015, she told DeFranco they would simply break up and she would move out. She did not express at that time that they were married and breaking up would necessitate a divorce, which would have been necessary if they married nearly one year earlier.

The use of girlfriend/boyfriend terminology in 2015 and 2016 in text messages was followed by the parties deciding to plan a wedding after they reconciled in 2016. In January 2017, DeFranco texted Fuller that he was "look[ing] forward to calling u my wife instead of my girlfriend." Rather than telling DeFranco she was already his wife, she replied "[t]hat means a lot hearing that!" Although they did not plan a wedding that would be legally binding, opting instead for a "symbolic" wedding, they were planning a wedding in Mexico and could have had reasons for opting not to make that their legal ceremony.

While there are numerous documents in the record in which DeFranco and Fuller represented themselves to be married, the trial court concluded those documents were created for the purpose of obtaining benefits only available to spouses and did not reflect an agreement to be married. The trial court's finding is

–20–

consistent with evidence in the record. With respect to the American Airlines affidavit, DeFranco testified he intended to make Fuller his domestic partner so she could enjoy flight benefits; his "[i]ntent was to get benefits from my employer." The same was true with regard to military benefits; he represented her as his spouse to obtain benefits. He testified he did not intend these representations to mean he was married. Additionally, the record includes documents, such as tax returns, in which the parties represented they were not married.

In this bench trial, the trial court was the fact finder and sole judge of the witnesses' credibility and weight to be given to their testimony. We may not substitute our judgment for that of the trial court. Considering all of the evidence in the record, we cannot conclude the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. We overrule Fuller's sole issue.

CONCLUSION

We affirm the trial court's June 24, 2019 Final Order.


/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

191203F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

| | |
|---|---|
| RHONDA JEAN FULLER, Appellant | On Appeal from the 382nd Judicial District Court, Rockwall County, Texas |
| No. 05-19-01203-CV    V. | Trial Court Cause No. 1-18-0724. Opinion delivered by Justice Nowell. |
| JOHN SCOTT DEFRANCO, Appellee | Justices Myers and Evans participating. |

In accordance with this Court's opinion of this date, the trial court's June 24, 2019 Final Order is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 18th day of November, 2020.